UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DONNA J. LEONARD,                    :
      Plaintiff,               :
                                :
        v.                   :   CA 05-362 M
                                :
MICHAEL J. ASTRUE,[1]               :
Commissioner,                        :
Social Security Administration,      :
      Defendant.               :

**MEMORANDUM AND ORDER**

This matter is before the Court on a request for judicial review of the decision of the Commissioner of Social Security ("the Commissioner"), denying continuing Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) ("the Act"). Plaintiff Donna J. Leonard ("Plaintiff") has filed a motion for summary judgment or, alternatively, for remand. Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the decision of the Commissioner.

With the parties' consent, this case has been referred to a magistrate judge for all further proceedings and the entry of

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d)(1), Commissioner Astrue is hereby substituted for Jo Anne B. Barnhart as Defendant in this action. See Fed. R. Civ. P. 25(d)(1) ("When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party ...."); see also 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  For the reasons stated herein, I find that the Commissioner's decision that Plaintiff was no longer disabled as of April 1, 2002, is supported by substantial evidence in the record and is legally correct.  Accordingly, I order that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Document ("Doc.") #8) ("Motion to Affirm") be granted and that Plaintiff's Motion for Summary Judgment (Doc. #7) ("Motion for Summary Judgment") be denied.

### Facts and Travel

Plaintiff was born on March 25, 1960, and was forty-three years of age at the time of the most recent hearing before an Administrative Law Judge ("ALJ").  (Record ("R.") at 24, 40, 149) She has an eleventh grade education and past relevant work experience as a stock clerk and laundry worker.  (R. at 18, 40-41)

Plaintiff protectively filed an application for DIB and SSI[2] on May 6, 1997, alleging an inability to work due to psychological problems.  (R. at 17, 148-53)  Her application was denied initially and on reconsideration, (R. at 65-66), and a request for a hearing before an ALJ was timely filed, (R. at 71, 93).  A hearing was conducted on April 13, 1998, (R. at 71), and in a decision dated April 24, 1998, Plaintiff was found to be disabled as of December 23, 1995, due to a borderline character disorder, (R. at 17, 71-76).[3]

_____

[2] Defendant states that "[t]he amount of Plaintiff's monthly DIB payment was such that she was not entitled to ongoing SSI benefits." Defendant's Memorandum in Support of Motion for Order Affirming the Decision of the Commissioner at 2; see also (R. at 36)(noting that issue was termination of Plaintiff's DIB and confirming that "[i]t's Title II only").

[3] Specifically, in the April 24, 1998, decision the ALJ found: that Plaintiff had not engaged in substantial gainful activity since her alleged onset date; that her borderline personality disorder was a

Plaintiff was subsequently notified that her disability had ceased as of April 1, 2002, due to medical improvements and that her eligibility for benefits would terminate as of the end of June, 2002.  (R. at 17, 80, 117-19)  On reconsideration, a disability hearing officer conducted a hearing, at which Plaintiff did not appear, and determined, in a decision dated October 11, 2002, that Plaintiff's condition had medically improved.  (R. at 17, 81, 120, 121-27)  Plaintiff thereafter filed a request for a hearing before an ALJ, indicating that she disagreed with the determination and alleging that she was still disabled.  (R. at 17, 131)  A hearing before an ALJ was held on December 16, 2003.  (R. at 17, 34)  Plaintiff, represented by counsel, appeared and testified.  (R. at 17, 34, 40-52, 53)  An impartial vocational expert, Michael LaRaia (the "VE"), also testified.  (R. at 17, 52-63)

On May 17, 2004, the ALJ issued a decision in which he found that Plaintiff had experienced significant medical improvement since the date of her last favorable decision, April 24, 1998, which improvement was directly related to her ability to work, and that as of her disability cessation date, April 1, 2002, her condition no longer precluded the performance of substantial gainful employment.  (R. at 17-26)  Accordingly, he concluded that her entitlement to benefits was properly terminated

---

severe impairment, but it did not meet or equal a listed impairment; that she had the residual functional capacity ("RFC") for work at all exertional levels, but her RFC was reduced by an inability to engage in a social environment and develop and form relationships, the fact that she often would experience deficiencies of concentration, persistence, or pace, and a history of one or two episodes of deterioration or decompensation in work or work-like settings; that her RFC precluded a return to her past relevant work; that there were no jobs which existed in significant numbers in the regional or national economy which she was capable of performing; and that she had been under a disability, as defined by the Act, since December 23, 1995.  (R. at 74-75)

effective June 30, 2002, the end of the second calendar month
after the month in which the disability ceased, because she was
no longer disabled within the meaning of the Act.  (R. at 26)
Plaintiff requested review by the Appeals Council, (R. at 13,
33), which on June 23, 2005, denied her request, (R. at 7-9),
thereby rendering the ALJ's decision the final decision of the
Commissioner, (R. at 7).

On August 23, 2005, Plaintiff filed a Complaint (Doc. #1) in
this Court.  Defendant's Answer (Doc. #4) was filed on December
27, 2005.  The case was referred on February 27, 2006, to this
Magistrate Judge.  See Order of Reference (Doc. #5).  On April
25, 2006, the Motion for Summary Judgment was filed, followed on
June 1, 2006, by the Motion to Affirm.

## Issue

The issue for determination is whether substantial evidence
in the record supports the decision of the Commissioner that
Plaintiff was no longer disabled within the meaning of the Act as
of April 1, 2002.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is
limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).
Although questions of law are reviewed de novo, the
Commissioner's findings of fact, if supported by substantial
evidence in the record,[4] are conclusive.  Id. (citing 42 U.S.C. §
405(g)).  The determination of substantiality is based upon an
evaluation of the record as a whole.  Brown v. Apfel, 71

---

[4] The Supreme Court has defined substantial evidence as "more
than a mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)
(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct.
206, 217 (1938)); see also Suranie v. Sullivan, 787 F.Supp. 287, 289
(D.R.I. 1992).

F.Supp.2d at 30 (citing <u>Irlanda Ortiz v. Sec'y of Health & Human
Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1999)("We must uphold the
[Commissioner's] findings ... if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate to
support his conclusion.")(second alteration in original)).  The
Court does not reinterpret the evidence or otherwise substitute
its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31
(citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148,
153 (1st Cir. 1989)).  "Indeed, the resolution of conflicts in
the evidence is for the Commissioner, not the courts."  <u>Id.</u> at 31
(citing <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d
218, 222 (1st Cir. 1981)(citing <u>Richardson v. Perales</u>, 402 U.S.
389, 399, 91 S.Ct. 1420, 1426 (1971))).

<b>Law</b>

To qualify for DIB, a claimant must meet certain insured
status requirements,[5] be younger than 65 years of age, file an
application for benefits, and be under a disability as defined by
the Act.  <u>See</u> 42 U.S.C. § 423(a) (2003).  An individual is
eligible to receive SSI if she is aged, blind, or disabled and
meets certain income requirements.  <u>See</u> 42 U.S.C. § 1382(a)
(2003).

The Act defines disability as the "inability to engage in
any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months ...."  42
U.S.C. 423(d)(1)(A).  A claimant's impairment must be of such
severity that she is unable to perform her previous work or any

---

[5] Plaintiff met the disability insured status requirements as of
her alleged onset date, December 23, 1995, and had acquired sufficient
quarters of coverage to remain insured when she was initially
determined to be disabled.  (R. at 25)

other kind of substantial gainful employment which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986).

## Medical Improvement

A claimant's continued entitlement to disability benefits must be reviewed periodically.  See 20 C.F.R. § 404.1594(a) (2006)(noting statutory requirement for such review);[6] see also 20 C.F.R. § 404.1589 (2006)("After we find that you are disabled, we must evaluate your impairment(s) from time to time to determine if you are still eligible for disability cash benefits.").  This evaluation is called a "continuing disability review."  20 C.F.R. § 404.1589.  Termination of benefits is governed by 42 U.S.C. § 423(f), see Cogswell v. Barnhart, No. Civ. 04-171-P-S, 2005 WL 767171, at *1 (D. Me. Mar. 14, 2005), which "provides in relevant part that benefits may be discontinued only if (1) there is substantial evidence to support a finding of medical improvement related to an individual's ability to work and (2) the individual is now able to engage in substantial gainful activity," Santiago v. Barnhart, 386 F.Supp.2d 20, 22 (D.P.R. 2005); see also 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a).

> Under the regulations, medical improvement is defined as "any decrease in the medical severity" of an impairment, and any such decrease "must be based on changes in the symptoms, signs and/or laboratory findings" associated with the claimant's impairment.  See 20 C.F.R. § 404.1594(b)(1).  To find medical improvement, the

---

[6] The Commissioner has promulgated similar regulations for evaluating medical improvement in DIB and SSI cases.  See 20 C.F.R. § 404.1594 (2006) (describing medical improvement standard for DIB); 20 C.F.R. § 416.994 (describing medical improvement standard for SSI). For convenience, the Court will cite to only one set of regulations.

> Commissioner must compare the prior and current medical
> evidence to determine whether there have been any such
> changes in the signs, symptoms and laboratory findings
> associated with the claimant's impairment. <u>Id.</u> (b)(7),
> (c)(1).

<u>Rice v. Chater</u>, 86 F.3d 1, 2 (1st Cir. 1996). "Medical improvement is related to [a claimant's] ability to work if there has been a decrease in the severity, as defined in paragraph (b)(1) of this section, of the impairment(s) present at the time of the most recent favorable medical decision[7] and an increase in [the claimant's] functional capacity to do basic work activities[8] as discussed in paragraph (b)(4) of this section." 20 C.F.R. § 404.1594(b)(3). "The residual functional capacity assessment used in making the most recent favorable medical decision will be compared to the residual functional capacity assessment based on current evidence in order to determine if [the claimant's] functional capacity to do basic work activities has increased." 20 C.F.R. § 404.1594(c)(ii). In addition:

> A determination that medical improvement related to [a
> claimant's] ability to do work has occurred does not,
> necessarily, mean that [the claimant's] disability will
> be found to have ended unless it is also shown that [the
> claimant is] currently able to engage in substantial
> gainful activity as discussed in paragraph (b)(5) of this
> section.

---

[7] The most recent favorable medical decision is the latest decision involving a consideration of the medical evidence and the issue of whether the claimant was disabled or continued to be disabled which became final ("comparison point decision"). <u>See</u> 20 C.F.R. § 404.1594(b)(7).

[8] "Basic work activities means the abilities and aptitudes necessary to do most jobs. Included are exertional abilities such as walking, standing, pushing, pulling, reaching and carrying, and nonexertional abilities and aptitudes such as seeing, hearing, speaking, remembering, using judgment, dealing with changes and dealing with both supervisors and fellow workers." 20 C.F.R. § 404.1594(b)(4).

20 C.F.R. § 404.1594(b)(3).  Vocational factors are considered at
this point.  See 20 C.F.R. § 404.1594(b)(5).  Any determination
made under 42 U.S.C. § 423(f) "shall be made on the basis of the
weight of the evidence and on a neutral basis with regard to the
individual's condition, without any initial inference as to the
presence or absence of disability being drawn from the fact that
the individual has previously been determined to be disabled."
42 U.S.C. § 423(f).

### ALJ's Decision

Following the procedure outlined in 20 C.F.R. § 404.1594(f)[9]
for evaluating whether Plaintiff's disability continued, the ALJ
in the instant case made the following findings: that Plaintiff
had not engaged in substantial gainful activity since the last
favorable decision ("comparison point decision") of April 24,
1998, (R. at 18, 25); that she had no impairment(s) which met or
equaled a listed impairment, (R. at 20-21, 25); that she had
experienced significant medical improvement in her condition

---

[9] An ALJ is directed to follow certain steps in reviewing the
question of whether a claimant's disability continues.  See 20 C.F.R.
§ 404.1594(f).  Review may cease and benefits may be continued if at
any point it is determined that there is sufficient evidence to find
the claimant is still unable to engage in substantial gainful
activity.  See id.  The steps are as follows: (1) is the claimant
engaged in substantial gainful activity; (2) if not, does she have an
impairment or combination of impairments which meets or equals the
severity of a listed impairment; (3) if not, has there been medical
improvement as defined in paragraph (b)(1) of this section; (4) if
there has been medical improvement, is it related to her ability to do
work, i.e., has there been an increase in her residual functional
capacity based on the impairment(s) that was present at the time of
the most recent favorable medical decision; (5) if there has been no
medical improvement or the medical improvement is not related to her
ability to work, do any exceptions apply; (6) if medical improvement
is shown to be related to her ability to do work, is her current
impairment(s) severe; (7) if her impairment(s) is severe, is she
currently able to do substantial gainful activity, specifically the
work she has done in the past; and (8) if she is not able to do the
work she has done in the past, given her residual functional capacity
and considering her age, education, and past work experience, is she
able to do other work.  See 20 C.F.R. 404.1594(f)(1)-(8).

since her comparison point decision, (R. at 18, 23, 25); that
this medical improvement was related to her ability to work,
(id.); that because the ALJ determined that there had been
medical improvement, it was unnecessary to determine whether any
exceptions to the medical improvement standard applied, (R. at
23); that Plaintiff's depression and anxiety disorders were
severe, (R. at 20, 25); that, nonetheless, she had the residual
functional capacity ("RFC") to perform the exertional demands of
work at all exertional levels, that her capacity for work was
diminished by moderate limitations in her ability to maintain
attention/concentration, deal appropriately with the public, co-
workers, and supervisors, and deal with ordinary requirements of
attendance, persistence, or pace, and that, therefore, she was
able to perform substantial gainful activity, specifically her
past relevant work as a laundry worker, (R. at 22-23, 25); that,
alternatively, as a younger individual within the meaning of the
regulations with an eleventh grade education, she was capable of
performing other work existing in significant numbers in the
national economy, (R. at 25); and that Plaintiff's statements
regarding her impairments and their impact on her ability to work
were not entirely credible, (R. at 21, 25).  The ALJ concluded
that Plaintiff was no longer disabled within the meaning of the
Act as of April 1, 2002.  (R. at 24, 26)

### Errors Claimed

Plaintiff alleges that: 1) the ALJ's decision that
Plaintiff's period of disability properly ceased on April 1,
2002, due to medical improvement related to her ability to work
is not based on substantial evidence, see Plaintiff's Memorandum
in Support of her Motion for Summary Judgment ("Plaintiff's
Mem.") at 14; and 2) the ALJ failed to give proper weight to the
opinion of Plaintiff's treating physicians, see Plaintiff's Mem.
at 16.

**Discussion**

## I.   Plaintiff's first claim of error

With regard to medical improvement, the ALJ found that Plaintiff had "experienced significant medical improvement of her condition from that at the time of her last favorable decision, dated April 24, 1998," (R. at 18); that "[t]his improvement is directly related to [her] ability to work," (id.); and that "[a]s of the disability cessation date of April 1, 2002, [her] condition no longer precluded the performance of substantial gainful activity ...," (id.).  Plaintiff argues that:

> At her hearing, both the plaintiff and her attorney acknowledged that the plaintiff's condition had improved since the point of comparison, the date of the ALJ decision finding her disabled.  However, the record since the point of comparison continues to reflect that the plaintiff experiences intense mood swings, additional periods of decompensation (her inability to maintain employment for more than three months at Stop and Shop in 2000 and her relapse into depression in April[] and December 2002).  Additionally, the record and the plaintiff's testimony support ongoing problems with her ability to establish and maintain interpersonal relations.
>
> ....
>
> The evidence contained in the record does not support the ALJ's finding that the plaintiff's psychiatric condition was improved such that she was able to perform substantial gainful activity.  The overall record reflects that the plaintiff continues to suffer the [e]ffects of borderline personality disorder as testified by [the medical expert] at the point of comparison.  Additionally, the conclusions reached by Dr. Abrahams and Dr. Parsons with respect to the plaintiff's limitations are entirely consistent with the findings made by the ALJ at the point of comparison and support a finding that the plaintiff remains disabled. The ALJ, in deciding to uphold cessation of the plaintiff's benefits[,] relies on his own lay analysis of the evidence and entirely missed the impact of the plaintiff's personality disorder on her ability to work.  Consequently, the plaintiff's case

10

should be remanded for further proceedings with a
psychiatric expert present to determine whether she
remains disabled as a result of her psychiatric
condition.

Plaintiff's Mem. at 15-16 (internal citations omitted).  The Court
finds the ALJ's determination of medical improvement to be
supported by substantial evidence.

As an initial matter, the ALJ properly compared the medical
evidence from the time of the comparison point decision to the
evidence of Plaintiff's condition as of her cessation date.  <u>See</u>
<u>Rice v. Chater</u>, 86 F.3d 1, 2 (1st Cir. 1996).  The ALJ stated:

The medical record reflects that before and around the
time of her Comparison Point Determination in April
19[9]8, the claimant had been hospitalized numerous times
with depression and somatoform disorder and [had] GAF
scores of 25 to 40.  A Global Assessment of Functioning
(GAF) Scale of 21 to 30 out of 100, according to the
<u>Diagnostic and Statistical Manual of Mental Disorders,</u>
<u>Fourth Edition</u>, denotes behavior that is considerably
influenced by delusions or hallucinations, or serious
impairment in communication or judgment, or inability to
function in almost all areas (e.g.[,] stays in bed all
day, no job, home, or friends).  A GAF of 40 indicates
major impairment in several areas such as work, family
relations, judgment, thinking or mood[] (e.g., a
depressed man is unable to work and avoids friends).

(R. at 19)  In contrast, the ALJ observed that currently:

[T]he claimant alleges disabling mental problems, yet the
claimant's medical record indicates that she has improved
significantly, with a GAF of 60 assessed by her treating
psychiatrist, indicating no more than moderate
symptoms.[10]  The claimant visits a psychiatrist 5 to 6

---

[10] The ALJ elaborated that in April 2002 Dr. Abrahams "assessed
Global Functioning (i.e., GAF) at 60.  According to the <u>Diagnostic and
Statistical Manual of Mental Disorders, Fourth Edition</u>, a score of 51
to 60 represents moderate symptoms (e.g.[,] flat affect and
circumstantial speech, occasional panic attacks) or moderate
difficulty in social or occupational functioning (e.g., few friends,
conflicts with others)."  (R. at 19-20)

times a year for medication review, and apparently does
not require more frequent medical assessment. She has not
had frequent changes in medication or dosage levels,
which would be expected if her treatment was not
considered effective in dealing with her complaints. The
claimant has not required crisis intervention or
hospitalization during the period now under adjudication.
This is not a record which suggests an ongoing level of
impairment so severe that all work would be precluded.

(R. at 21)(internal citation omitted).

The ALJ also properly compared the RFC from the comparison
point decision to Plaintiff's current RFC. See 20 C.F.R. §
404.1594(c)(ii). The ALJ noted that the RFC assessed in the
April 24, 1998, decision was that Plaintiff "had no exertional
limitations, but she was unable to engage in a social environment
and develop and form relationships; often experiencing
deficiencies of concentration, persistence or pace; with a
history of one or two episodes of deterioration or decompensation
in work or work-like [settings]." (R. at 18) In evaluating
Plaintiff's RFC as of her cessation date, the ALJ stated that
she:

had the [RFC] to perform the exertional demands of work
at all exertional levels. [Her] capacity for work is
diminished, however, in that she is moderately limited in
her ability to maintain attention/concentration; deal
appropriately with the public, co-workers and
supervisors; and deal with ordinary requirements of
attendance, persistence or pace.

(R. at 22-23)(footnote omitted). He therefore concluded that
"[t]he current [RFC] shows that [she] is able to perform
considerably more work activity than she could perform under the
previous residual functional capacity ...." (R. at 23)

The ALJ then relied on the testimony of the VE, which he
found to be "reasonable and well supported, and ... accepted as
persuasive ...," (R. at 24), that Plaintiff's "current [RFC]
would allow her to return to her past work as a laundry worker,"

12

(R. at 24).  Alternatively, the VE "testified that assuming [her] specific work restrictions as noted above, she would be capable of making a vocational adjustment to light exertion unskilled work in packaging, assembly, and cleaning.  There are 2,692 light packaging jobs, 3,378 light assembly jobs and 2,200 light cleaner positions in the Rhode Island — southeastern Massachusetts regional economy ...."  (Id.)

These findings are supported by substantial evidence in the record, most significantly from the Northern Rhode Island Community Mental Health Center ("NRICMHC"), (R. at 405-25, 430-75), where Plaintiff received treatment for major depressive disorder, recurrent, severe without psychotic features, generalized anxiety disorder, and borderline personality disorder, (R. at 405-08).  In addition, the ALJ's findings are consistent with those of the non-examining agency doctors, (R. at 393-98, 399-404), and with the testimony of the VE at the December 16, 2003, hearing, (R. at 55-63).

Treatment notes from a Dr. Turanski at NRICMHC reflect that Plaintiff was doing well.  For example, on February 12, 2001, Dr. Turanski indicated that Plaintiff was "[d]oing well in spite of being off Xanax [and] hasn't required Ambien to sleep well."  (R. at 405)  Plaintiff denied any anxiety.  (R. at 406)  Dr. Turanski's impression was that Plaintiff's mood had improved since her last visit.  (R. at 405)  According to Dr. Turanski's note, Plaintiff was interacting with women she had met online and was being supportive of several who were going through difficult relationships and depression, (id.), but Plaintiff was "[n]ot thinking of working again until the spring," (R. at 406).

Dr. Turanski reported on June 12, 2001, that Plaintiff "[c]ontinues to feel emotionally stable [with] no disabling depression or anxiety other than when one relationship ends [and] another begins."  (R. at 407)  Plaintiff was "[s]till very

involved on the internet ...," (R. at 407), and there were "[n]o issues of concern," (id.).  Dr. Turanski's impression was that Plaintiff was "[s]table on current medication."  (Id.)  However, Plaintiff did not "feel able to seek work or training because of feeling afraid that she'll again fail because of overwhelming anxiety."  (R. at 407-08)

On September 5, 2001, Dr. Turanski changed Plaintiff's Axis I diagnosis to major depressive disorder, recurrent, in full remission.  (R. at 409)  The doctor indicated that Plaintiff "[c]ontinues to do well with infrequent depressive episodes, short in length, usually resulting from a loss of relationship and appropriate to the circumstance.  No persistent anxiety.  Sleeping well."  (Id.)  Dr. Turanski's impression was that there was "[n]o evidence of depression with little anxiety [and] no longer any need for benzodiazepine."[11]  (Id.)

Heather Abrahams, M.D., began treating Plaintiff on October 30, 2001.  (R. at 411)  According to Dr. Abrahams, Plaintiff was "doing well.  No anxiety or depression.  Dealing [with] [girlfriend] leaving her.  Looking for a new relationship.  Involved [with] horse, [and] internet activities.  Feels meds are helpful.  Has reduced Effexor ....  No complaints or problems."  (Id.)  Dr. Abrahams' assessment was that Plaintiff was stable and doing well.  (Id.)

On January 30, 2002, according to Dr. Abrahams' notes, Plaintiff reported that she was "doing well—going out, singing Karaoke, seeing friends."  (R. at 413)  She had broken up with an online girlfriend and "[w]as upset over this—depressed for a few days but now is fine."  (R. at 413)  Plaintiff denied mood or thought problems and had reduced her Effexor without difficulty.

---

[11] A benzodiazepine is "any of a group of aromatic lipophilic amines (as diazepam chlordiazepoxide) used esp[ecially] as tranquilizers."  Merriam Webster's Medical Desk Dictionary 80 (1996).

14

(R. at 413)  Dr. Abrahams indicated that Plaintiff was "[d]oing well, very stable."  (Id.)

Dr. Abrahams next saw Plaintiff on March 26, 2002, "to fill out disability paperwork."  (R. at 415)  Plaintiff complained of some fatigue, sadness, low mood and energy, and loss of interest. (Id.)  Dr. Abrahams recorded her assessment of Plaintiff as "tired [and] sad but OK."  (Id.)

On April 29, 2002, Dr. Abrahams completed an Updated Psychiatric Assessment of Plaintiff.  (R. at 417-18)  According to Dr. Abrahams' report:

> [Plaintiff's] last assessment was on April 27, 1999[,] by Dr. Turanski.  At that time she was fairly stable, she had been feeling well, was social, was free from anxiety and was in general asymptomatic.  Since her last assessment she has had no hospitalizations but today presents with a return of some depressive and anxiety symptoms.  She reports that since January she has become isolative, has stopped seeing friends, has stopped singing Karaoke and has spent less time chatting with people on line.  She reports her main activity is taking care of her horse although she states she does not ride or groom this anymore.  [She] has been stable for a long time on Effexor XR - 75 mgs b.i.d. and Paxil - 20 mgs q hs.  In January [she] requested to decrease her Effexor to 75 mgs qd as she had been feeling quite well.  It appears that she may be slipping back into some depression and has agreed to increase her Effexor back up to 150 mgs qd.  At this time [she] reports a great deal of anxiety because she has been informed that her Social Security benefits are to be discontinued.  She is planning to appeal but is concerned that they will take away her insurance in the future ....

(R. at 417)  In addition, "[i]n describing her last job at Stop & Shop stacking shelves [Plaintiff] became upset and stated that she could not handle that work even though it was something she had actually looked forward to."  (R. at 417)  Dr. Abrahams observed that Plaintiff "note[d] a breakup with a girlfriend which may have contributed to her current depression but there

15

was also a decrease in her Effexor at that time."  (R. at 418)
Dr. Abrahams also stated that Plaintiff's speech was clear and
logical; that her cognition appeared intact and her insight and
judgment appeared fair to good; that her affect was quite
blunted; that she described her mood as anxious and depressed;
that she denied suicidal or homicidal ideation, auditory or
visual hallucinations, and changes in sleep or appetite; that
there was no evidence of a psychotic thought process; and that
she noted some isolative tendencies and had been withdrawing from
friends and activities.  (R. at 418)  Dr. Abrahams diagnosed
Plaintiff with major depressive disorder, recurrent, severe
without psychotic features (currently in partial remission);
generalized anxiety disorder; borderline personality; and a GAF
of 60.  (Id.)

        Dr. Abrahams next saw Plaintiff on June 24, 2002.  (R. at
420)  The doctor observed that Plaintiff "remain[ed] somewhat
depressed–anhedonia, not doing online activities.  Still takes
pleasure in her horse.  Concerned about disability benefits ...."
(Id.)  No change was noted as a result of increasing Plaintiff's
Effexor, and Dr. Abrahams stated that Plaintiff's medication
would be changed to Effexor XR.  (Id.)

        One month later, Dr. Abrahams saw Plaintiff and recorded
that Plaintiff was in a good mood because her ex-girlfriend had
returned.  (R. at 422)  Plaintiff was happy, with no concerns
about future problems with her girlfriend, and was "[n]ot having
any other concerns at this time," (id.), despite the fact that
there was "[s]till no decision from disability," (id.).

        Subsequently, in September of 2002, Dr. Abrahams indicated
that Plaintiff was "doing well - singing Karaoke again, back
[with] ex-[girlfriend].  Feeling happy - got a truck, caring for
her horse."  (R. at 424)  According to Dr. Abrahams' notes,
Plaintiff felt "meds are working well.  No new issues."  (Id.)

Dr. Abrahams reported on January 14, 2003, that Plaintiff had had another bout of depression over Christmas, lasting fourteen days, during which Plaintiff spent two weeks in the same clothes, did not shower, and did not speak to anyone.  (R. at 430)  However, according to Dr. Abrahams' notes, Plaintiff was "now feeling better, more social, meeting people," (id.), was "improving," (id.), and [a]ppear[ed] to be doing well on an increased dose of Effexor," (id.).

On March 23, 2003, Dr. Abrahams' assessment was that Plaintiff's mood was still anxious.  (R. at 453)  According to Dr. Abrahams, Plaintiff still had "some anxiety about disability, work, etc.  Feels unable to cope [with] stress of work - remembering past failures, ruminating."  (Id.)  However, Plaintiff was "[d]oing some household chores at times," (id.), and they discussed the possibility of again decreasing Plaintiff's medication, (id.).

Dr. Abrahams' assessment remained unchanged two months later.  (R. at 460)  Plaintiff complained of memory problems such as forgetting appointments.  (Id.)  Dr. Abrahams noted that Plaintiff "[f]eels unable to return to work - feels she will decompensate."  (Id.)

On August 27, 2003, Dr. Abrahams observed that Plaintiff was doing well and feeling well.  (R. at 470)  She was helping a close friend whose daughter had been injured.  (Id.)  Dr. Abrahams' assessment was that Plaintiff was "[r]elatively stable, no new issues."  (Id.)

Notes from Plaintiff's caseworkers at NRICMHC are also mainly positive.  On January 21, 2003, for example, her caseworker noted that Plaintiff "appeared in good spirits overall [and] seems to be doing well.  [She] seems to be dealing [with] her current issues well [with] support from [caseworker]."  (R. at 446)  Plaintiff reported on March 11, 2003, that she was

17

"doing fine."  (R. at 450)  On March 19, 2003, Plaintiff's case
manager stated that Plaintiff "appeared to be ... stable.  [She]
did not display any signs of decomp[ensation].  [She] is not [at]
risk."  (R. at 452)  The same observations were made on April 16,
June 13, July 17, and July 23, 2003.  (R. at 457, 463, 467, 469)
On August 27 and October 17, 2003, another caseworker observed
that Plaintiff was cooperative, logical, and coherent, expressed
no suicidal or homicidal ideation, and showed no signs of
decompensation.  (R. at 473, 475)

It is abundantly clear from the foregoing summary of the
medical evidence from Plaintiff's practicioners at NRICMHC that
substantial evidence supports the ALJ's finding of medical
improvement.  In addition, the ALJ's findings are consistent with
those of the non-examining Disability Determination Services
("DDS") consultants.  Michael Slavit, Ph.D., reviewed the record
for DDS in the spring of 2002, (R. at 393-98), and concluded that
Plaintiff's condition had improved, (R. at 397).  He based this
conclusion on treatment notes from NRICMHC[12] and a telephone
contact with Dr. Abrahams.[13]  (R. at 396-98)  J. Stephen Clifford,

---

[12] According to Dr. Slavit, although Plaintiff's report of her
activities of daily living indicated otherwise, (R. at 235-37),

> notes from No. RI CMHC of 6/12/01, 9/5/01, 10/30/01 and
> 1/30/02 indicate she's stable, with very short-lived, non-
> severe episodes of depress[ion,] that she is reducing her
> medication and remaining stable, goes out and sings Karaoke,
> is involved [with] her horse and the internet, does not get
> drunk, and denies mood or thought problems, [and] sleeps well.

(R. at 397)

[13] Dr. Slavit quoted Dr. Abrahams' statements regarding Plaintiff
that "[c]ognitively she's fine," (R. at 398), and that she "ha[d] no
problems relating to [Dr. Abrahams], to her case manager, or to office
staff," (id.), was "not difficult, not argumentative, not defiant,"
(id.), and was "sufficiently 'computer savvy' to surf the net and to
participate in on-line groups," (id.).  Dr. Slavit's summary of the
conversation continued: "She takes care of and rides a horse and,
though her affect is somewhat blunted, 'her face lights up when she

Ph.D., also reviewed the record for DDS in June, 2002.[14]  (R. at 399-404)  Dr. Clifford concluded that Plaintiff's condition had improved and that she was largely asymptomatic.  (R. at 403)

Substantial evidence also supports the ALJ's finding that Plaintiff's medical improvement was related to her ability to work.  (R. at 23)  Although Dr. Abrahams opined that Plaintiff had a substantial loss of ability to make simple work-related decisions, respond to supervision, co-workers, and usual work situations, and to deal with changes in a routine work setting, (R. at 426), the ALJ apparently rejected this opinion as inconsistent with the record and relied instead on the assessments of the DDS non-examining physicians, (R. at 23).  Dr. Slavit completed a Mental Residual Functional Capacity Assessment in which he found Plaintiff to be no more than moderately limited in any area.  (R. at 393-94)  He also included a detailed functional capacity assessment in which he noted that Plaintiff could "understand and remember simple and complex directions as evidenced by Dr. Abrahams's [sic] comment that '[c]ognitively, she is intact,' by Dr. Abraham's [sic] answer that she always understands her in sessions, and by the fact that claimant can surf the net and participate in on-line groups," (R. at 395); that Plaintiff's concentration was adequate for routine and more complex tasks for two-hour periods throughout an eight-hour workday based on her ability to care for and ride her horse as well as spend hours at her computer, (R. at 395); that Plaintiff could "get along with coworkers and supervisors as evidenced by treatment notes that state that she goes out socially, sings

talks about her horse.'" (Id.)

[14] Dr. Clifford submitted a Mental Health Residual Functional Capacity Assessment, a form entitled Comparison of Symptoms, Signs and Laboratory Data of Impairments Considered at CPD, and a Medical Consultant Review form, both dated June 19, 2002.  (R. at 399-04)  The latter two forms are marked "advisory."  (R. at 403-04)

Karaoke, relates well to friends, and by Dr. Abraham's [sic]
comment that she has no problems getting along with the doctor,
case manager, or office staff," (id.); and that Plaintiff could
cope with changes, based on treatment notes indicating that she
had recently experienced the break-up of a relationship and was
fine after a few days of mild depression, and could transport
herself and avoid work hazards, (id.).  On the same mental RFC
assessment, Dr. Clifford found Plaintiff to be not significantly
limited in all listed areas.  (R. at 399-400)  In noting that
there were no significant limitations or restrictions, Dr.
Clifford elaborated that "[t]reat[]ment note from 10/30/01 states
'no depression, no anxiety.'  Note from 1/30/02 states claimant
is 'doing well, very stable.'  She seems to have been
consistently symptom free and has no relate[d] restrictions."
(R. at 401)

The ALJ was entitled to resolve such conflicts in the
evidence.  See Irlanda Ortiz v. Sec'y of Health & Human Servs.,
955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts
in the evidence and the drawing of conclusions from such evidence
are for the [Commissioner].");  Rodriguez v. Sec'y of Health &
Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)("[T]he resolution
of conflicts in the evidence and the determination of the
ultimate question of disability is for [the Commissioner], not
for the doctors or for the courts.")(citing Richardson v.
Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426 (1971)).
Moreover, an ALJ is not bound by treating physician opinions "on
issues reserved to the Commissioner because they are
administrative findings that are dispositive of a case; i.e.,
that would direct the determination or decision of disability."

20 C.F.R. § 404.1527(e)[15] (internal citations omitted); see also Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)("The ALJ was not required to accept the conclusions of claimant's treating physicians on the ultimate issue of disability.").

Having determined that Plaintiff had experienced medical improvement related to her ability to work, the ALJ proceeded to the question of whether Plaintiff was capable of performing substantial gainful activity.  (R. at 24)  In making this determination, he relied on the testimony of the VE:

> Based on the testimony of the vocational expert, the undersigned has concluded that considering [Plaintiff's] age, educational background, work experience, and residual functional capacity, she is capable of both

---

[15] Section 404.1527(e) provides that:

Opinions on some issues, such as the examples that follow, are not medical opinions ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.
> (1) Opinions that you are disabled.  We are responsible for making the determination or decision about whether you meet the statutory definition of disability.  In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled.  A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
> (2)  Other opinions on issues reserved to the Commissioner.  We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s).  Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity, or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

20 C.F.R. § 404.1527(e) (internal citations omitted).

> returning to past relevant work ... and also of making a
> successful adjustment to work which exists in significant
> numbers in the national economy.

(R. at 24)  The ALJ was entitled to do so if the hypothetical
posed to the VE accurately represented Plaintiff's limitations.
See Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 447
(1st Cir. 1991)("Since this hypothetical was supported by
substantial evidence ... the ALJ was entitled to rely on the
vocational expert's testimony that a claimant with those mental
impairments can perform a number of light jobs in the garment
industry.").  Here, the ALJ directed the VE to

> consider a hypothetical claimant, starting with a
> residual functional capacity for work at all exertional
> levels, but with limitations in several areas of non-
> exertional functioning as follows for purposes of my
> first question: I'd like you to consider the claimant to
> be moderately impaired in areas of maintaining attention,
> concentration; dealing with public, coworkers and
> supervisors; and dealing appropriately with ordinary
> expectations of attendance, perseverance and pace.

(R. at 55)  These limitations are supported by the assessments of
Drs. Slavit and Clifford.  (R. at 393-95, 399-401)  Asked whether
such a claimant could perform her past relevant work, or other
work which existed in the national economy, the VE responded
affirmatively.  (R. at 57-58)  Accordingly, the Court concludes
that substantial evidence supports the ALJ's finding that
Plaintiff was capable of performing her past relevant work as a
laundry worker as well as making a vocational adjustment to other
work.

     Finally, Plaintiff asserts that the ALJ "relie[d] on his
own lay analysis of the evidence ...," Plaintiff's Mem. at 16,
thereby requiring remand "for further proceedings with a
psychiatric expert present ...," id.  The Court rejects this
assertion.  See Arroyo v. Sec'y of Health & Human Servs., 932
F.2d at 89 ("The ALJ did not impermissibly substitute h[is] lay

assessment of claimant's RFC, but supportably relied on those
submitted by the nonexamining consultant."). Moreover, "[u]se of
a medical advisor in appropriate cases is a matter left to the
[Commissioner's] discretion; nothing in the Act or regulations
requires it." Rodriquez Pagan v. Sec'y of Health & Human Servs.,
819 F.2d 1, 5 (1st Cir. 1987)(rejecting assertion that Secretary
should have arranged for testimony by a medical advisor)(citing
Richardson v. Perales, 402 U.S. 389, 408, 91 S.Ct. 1420, 1430
(1971)).

The Court finds that substantial evidence supports the ALJ's
finding that Plaintiff was no longer disabled as of her cessation
date of April 1, 2002. The ALJ could reasonably have found that
Plaintiff had experienced medical improvement, that the medical
improvement was related to her ability to work, and that as of
April 1, 2002, she was capable of performing substantial gainful
activity. See Rodriquez v. Sec'y of Health & Human Servs., 647
F.2d 218, 222 (1st Cir. 1981)("We must uphold the
[Commissioner's] findings in this case if a reasonable mind,
reviewing the evidence in the record as a whole, could accept it
as adequate to support his conclusion."); see also Irlanda Ortiz
v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir.
1991)(quoting Rodriquez). Accordingly, Plaintiff's first claim
of error is rejected.

**II.  Plaintiff's second claim of error**

Plaintiff also argues that the ALJ "decided to afford no
probative value to any of the plaintiff's treating or examining
physicians' estimation of the plaintiff's condition," Plaintiff's
Mem. at 17, in violation of the regulations and Social Security
Ruling ("SSR") 96-2p, id. at 16. The Court disagrees.

According to 20 C.F.R. § 404.1527(d):

Generally, we give more weight to opinions from your
treating sources, since these sources are likely to be

the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion of the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.[16]

20 C.F.R. § 404.1527(d)(2) (2006); see also SSR 96-2p, 1996 WL 374188, at *2 (noting that treating source opinions are entitled to deference even if they do not meet the test for controlling weight). When a treating source's opinion is not given controlling weight and the determination or decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

---

[16] The factors to be considered when a treating source's medical opinion is not given controlling weight are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the support-ability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the source; and (6) other factors. 20 C.F.R. § 404.1527(d)(2)-(6) (2006). The "other factors" include "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record ...." 20 C.F.R. § 404.1527(d)(6).

treating source's medical opinion and the reasons for that
weight." SSR 96-2p, at *5; see also 20 C.F.R. 404.1527(d)(2)
("We will always give good reasons in our notice of determination
or decision for the weight we give your treating source's
opinion."). Opinions from non-treating medical sources are
evaluated using the factors referenced above. See 20 C.F.R. §
404.1527(d); see also n.16 (listing factors).

With reference to Dr. Abrahams, Plaintiff argues that "[t]he
ALJ makes no mention of Dr. Abrahams' estimation of the
plaintiff's limitations in the medical questionnaire Dr. Abrahams
completed, let alone explain[s] why he has give[n] no weight to
her opinion regarding the impact of the plaintiff's condition on
her ability to work." Plaintiff's Mem. at 17. The Court finds
that the ALJ did, in fact, give some weight to the opinion of Dr.
Abrahams in finding that Plaintiff's psychiatric condition had
improved. Cf. Arroyo v. Sec'y of Health & Human Servs., 932 F.2d
82, 89 (1st Cir. 1991)("The law in this circuit does not require
ALJs to give greater weight to the opinions of treating
physicians."). The ALJ summarized the evidence from Plaintiff's
psychiatrist as follows:

> The claimant's treating physician, Dr. Heather
> Abrahams, related on April 2, 2002, that the claimant was
> cognitively "fine," with no problems relating to others
> with whom she dealt with [sic] in the office. She was
> not argumentative, defiant, nor difficult. The doctor
> noted that the claimant took care of and rode horses.
> She also was sufficiently computer savvy to "surf the
> net" and participate in online groups. Her affect was
> somewhat blunted.
>  Dr. Abrahams performed a psychiatric assessment of the
> claimant on April 29, 2002. She reported that since
> January the claimant had become isolative and had stopped
> seeing friends or chatting with people on line. She
> continued to groom horses but did not ride anymore. She
> was anxious since being told that her Social Security
> Benefits are to be discontinued. The claimant had a
> blunted affect with an anxious and depressed mood. She

denied sleep or appetite changes.  The examiner noted
that the claimant's cognition appeared intact, with fair
to good insight and judgment.  Dr. Abrahams diagnosed
recurrent major depressive disorder without psychotic
features, currently in partial remission; generalized
anxiety disorder; and borderline personality [disorder].
Substance abuse by history was in remission.  The doctor
assessed Global Functioning (i.e., GAF) at 60.  According
to the <u>Diagnostic and Statistical Manual of Mental
Disorders, Fourth Edition</u>, a score of 51 to 60 represents
moderate symptoms (e.g.[,] flat affect and circumstantial
speech, occasional panic attacks) or moderate difficulty
in social or occupational functioning (e.g., few friends,
conflicts with others)[.]

(R. at 19-20)(internal citations omitted).  Although the ALJ did
not assign a specific weight to Dr. Abrahams' opinion, it is
clear that he considered her treatment notes and found them
persuasive.  The ALJ also recognized that Plaintiff's condition
had deteriorated somewhat in early 2002.

It is true that the ALJ failed to address the April 22,
2003, Medical Questionnaire submitted by Dr. Abrahams, in which
she opined that Plaintiff had a substantial loss of ability to
make simple work-related decisions, respond appropriately to
supervision, co-workers, and usual work situations, and changes
in a routine work setting.  (R. at 426-27)  However, the Court
finds his failure to do so to be harmless error.  <u>See</u> <u>Fisher v.
Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989)(noting that, although
an ALJ's opinion may be vulnerable, "[no] principle of
administrative law or common sense requires [a court] to remand a
case in quest of a perfect opinion unless there is reason to
believe that remand might lead to a different result."); <u>Seymour
v. Barnhart</u>, No. 02-197-B-W, 2003 WL 22466174, at *3 (D. Me. Oct.
31, 2003)("We have often held that [a]n arguable deficiency in
opinion-writing technique is not a sufficient reason for setting
aside an administrative finding ... where the deficiency probably
ha[s] no practical effect on the outcome of the case.")(quoting

Bryant ex rel. Bryant v. Apfel, 141 F.3d 1249, 1252 (8th Cir.
1998)(alterations in original); cf. SSR 96-2p, 1996 WL 374188, at
*2 (noting that "it is not unusual for a single treating source
to provide medical opinions about several issues" and that
"[a]djudicators must use judgment based on the facts of each case
in determining whether, and the extent to which, it is necessary
to address separately each medical opinion from a single
source").  The April 22, 2003, report is inconsistent with other
evidence in the record, see SSR 96-2p, at *2 ("It is an error to
give an opinion controlling weight because it is the opinion of a
treating source if it is ... inconsistent with the other
substantial evidence in the case record."), namely Dr. Abrahams'
own treatment notes, see Discussion Section I supra at 13-18, and
the reports of the non-examining Disability Determination
Services ("DDS") physicians who are considered experts and who
reviewed Dr. Abrahams' treatment notes, see id. at 18-20; see
also 20 C.F.R. § 404.1527(f)(2)(i) ("State agency medical and
psychological consultants and other program physicians and
psychologists are highly qualified physicians and psychologists
who are also experts in Social Security disability evaluation.
Therefore, administrative law judges must consider findings of
State agency medical and psychological consultants or other
program physicians or psychologists as opinion evidence ....").
As noted previously, it is the ALJ's responsibility to resolve
conflicts in the evidence.  See Irlanda Ortiz v. Sec'y of Health
& Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981).

     As for Dr. Parsons, Plaintiff argues that the ALJ "gave
significantly reduced evidentiary weight to Dr. Parsons' opinion
because that opinion was given at the request of plaintiff's
counsel."  Plaintiff's Mem. at 17 (internal citation omitted).

In fact, the ALJ listed several reasons for the weight accorded to Dr. Parsons' opinion.  After summarizing Dr. Parsons' report,[17] (R. at 20), the ALJ stated that:

> The undersigned gives significantly reduced evidentiary weight to the observations of consultative psychologist John P. Parsons, Ph.D., who was hired by counsel to examine the claimant and provide a report to be used in support of the claim for disability benefits.  Dr. [P]arsons assessed a Global Assessment of Function (GAF) of 50, which represents serious symptoms or serious impairment in social or occupational functioning.  He stated that the claimant's depression and anxiety would make it difficult to maintain gainful employment on a sustained basis with limited drive and energy and compromised ability to function in a routine work situation because of her emotional issues.  This opinion is not supported by well documented medical evidence, treatment records or statements of the claimant regarding her daily activities and physical abilities.  The

---

[17] The ALJ stated that:

The claimant was examined by psychologist John P. Parsons, Ph.D., on December 15, 2003, in an evaluation arranged for by claimant's counsel.  Dr. Parsons noted that the claimant had two psychiatric hospitalizations in 1996 and 1997.  She receives outpatient psychotherapy and sees a psychiatrist 4 or 5 times a year for medication management, including Paxil and Effexor.  On examination the psychologist diagnosed moderate recurrent major depressive disorder, and generalized anxiety disorder with a Global Assessment of Function (GAF) Scale of 50.  According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, a score of 50 represents serious symptoms or serious impairment in social or occupational functioning.  The examiner opined that the claimant had a fair prognosis with treatment and would be able to manage funds on her own behalf.  He s[t]ated that the claimant's depression and anxiety would make it difficult to maintain gainful employment on a sustained basis with limited drive and energy and compromised ability to function in a routine work situation because of her emotional issues.

(R. at 20)(internal footnote and citation omitted); see also (R. at 476-82).  Dr. Parsons completed a Supplemental Questionnaire as to Residual Functional Capacity in which he indicated that Plaintiff was moderately severely limited in seven areas, moderately limited in four areas, and mildly limited in one area of functioning.  (R. at 483-84)

opinions are not supported by citation to any clinical or laboratory tests. The described limitations are conclusory, and appear to be based in large part on statements made by the claimant and uncritically received by the examiner.[18] Overall, the findings appear to be affected by bias or patient accommodation.

(R. at 22)(internal citations omitted).

The ALJ recognized that Dr. Parsons was a consulting psychologist, not a treating, source. (R. at 22) Therefore, his opinion could not have been accorded controlling weight. See SSR 96-2p, at *2 (July 2, 1996)("[O]pinions from sources other than treating sources can never be entitled to 'controlling weight.'"). More significantly, the ALJ found that Dr. Parsons' opinion was not well-supported and, implicitly, inconsistent with

---

[18] Here, the ALJ includes a footnote in which he references a prior footnote, "the subject matter of which is referenced here as an example of a statement made by the claimant and recited by Dr. Parsons without further inquiry, an inquiry which in this case would have led to a conclusion different than the unadorned reference to 'two psychiatric hospitalizations.'" (R. at 22 n.2) The prior footnote reads as follows:

This [reference to two psychiatric hospitalizations] is only partially true: The 1996 admission, to Memorial Hospital, was much more for physical medical problems than any mental/emotional difficulty: Although "anxiety" is listed as a discharge diagnosis (after "post enteritis malabsorption" and "gardnerella vaginalis infection[]"[)] treatment was entirely by specialists in physical medicine, and there was no formal mental status evaluation or any other indicia of significant concern by the claimant or her treating sources regarding mental impairment. The claimant's 1997 admission, on the other hand, was for treatment of mental impairment.

(R. at 20 n.1)(internal citation omitted). It appears, however, that the ALJ overlooked Plaintiff's March 1996 psychiatric hospitalization at Landmark Medical Center. (R. at 276-81) This error is not fatal. See Perkins v. Massanari, No. 01-C-003-C, 2001 WL 34382041, at *11-12 (W.D. Wis. Aug. 22, 2001)(noting that even if one reason given by the ALJ for rejecting a medical source opinion is invalid, the "court must defer to the ALJ's weighing of [the doctor's] opinion if the other reason he provided is supported by substantial evidence in the record").

other evidence in the record, (id.), stating that:

> This opinion is not supported by well documented medical evidence, treatment records or statements of the claimant regarding her daily activities and physical abilities. The opinions are not supported by citation to any clinical or laboratory tests. The described limitations are conclusory, and appear to be based in large part on statements made by the claimant and uncritically received by the examiner.

(R. at 22)(internal citation omitted); see also 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Accordingly, the Court finds no error in the ALJ's decision to accord Dr. Parsons' opinion "significantly reduced weight."

The Court finds that the ALJ's treatment of the opinions of Plaintiff's treating psychiatrist, Dr. Abrahams, and examining psychologist, Dr. Parsons, was proper. Accordingly, the Court declines to remand on this issue.

### Summary

The Court finds that the ALJ's determination that Plaintiff was no longer disabled as of her cessation date of April 1, 2002, is supported by substantial evidence in the record. In addition, the ALJ did not err in his treatment of the opinions of Plaintiff's treating and examining sources.

### Conclusion

The ALJ's determination that Plaintiff was no longer disabled and was capable of performing substantial gainful employment as of her cessation date of April 1, 2002, is

supported by substantial evidence in the record and is legally
correct.  The Court, therefore, grants Defendant's Motion to
Affirm and denies Plaintiff's Motion to Remand.


/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
May 9, 2007